## In re P. J. POTTER'S SONS.

### (District Court, W. D. Kentucky. February 16, 1906.)

BANKRUPTCY—CLAIMS ENTITLED TO PRIORITY.

A member of a banking firm made a loan, taking a note and a mortgage on real estate as security in his own name as agent. He afterward sold and transferred the note and mortgage and thereafter collected the interest as it came due and remitted the same to the owner. Before the maturity of the note the maker desired to pay it, and, the owner being absent, the banker received the money, placed it to the credit of the owner in the bank, and promised the maker to obtain and surrender the note and mortgage within a short time. He had no authority from the owner to accept payment, and both the bank and himself were at the time insolvent and were soon thereafter adjudged bankrupts; the owner of the note not having surrendered the same nor received the money. *Held*, that the payment created the relation of debtor and creditor between the bank and the payor and entitled the latter to prove her claim in bankruptcy therefor, but that, in the absence of any statute or rule of decision in the state which gave priority to her debt, the transaction gave her no right to priority of payment of the same, under Bankr. Act July 1, 1898, c. 541, § 64b (5), 30 Stat. 563 [U. S. Comp. St. 1901, p. 3448], as a debt entitled to priority by the laws of the state or the United States.

In Bankruptcy. On trustee's petition for review of the ruling of the referee on the claim of Ella H. Smith.

John E. Dubose and John B. Baskin, for trustee.
John B. Rodes, for claimant.

EVANS, District Judge. Shortly stated, the essential general facts are that about 4 p. m., on April 21, 1905, the banking firm of P. J. Potter's Sons, and J. E. Potter and W. J. Potter, who composed the firm, as individuals, made a general deed of assignment for the benefit of their creditors to E. L. Mottley, as assignee, who promptly accepted the trust, and soon afterwards entered upon the discharge of the duties thereof. Alleging the making of the general deed of assignment to be an act of bankruptcy, certain creditors, in July, 1905, filed their petition in these proceedings, seeking to have both the firm and the individual members thereof adjudged bankrupt, and, the facts being clear, the adjudication was accordingly made on September 11, 1905. Subsequently the said E. L. Mottley was appointed trustee of the bankrupts in succession to himself as assignee under the deed of assignment, and he duly qualified as trustee. Though the public did not know it, the firm was utterly insolvent, at least, for some months previous to April 21, 1905, and must be pre-

sumed to have known their financial condition. Certainly they appear to have been resorting to many devices to keep up their credit, and keep their banking house going. It would appear that at the date of the assignment the firm liabilities were about $650,000, which amount was owing to several thousand creditors, and their assets have been appraised at about $300,000. It also appears that the individual indebtedness of J. E. Potter was about $100,000, and that his assets, at least nominally, were about $175,000, and that the individual indebtedness of W. J. Potter was $30,000, and his nominal assets were $50,000.

It appears that J. E. Potter negotiated the most, if not all, of the loans made by the firm, and also had charge of and rediscounted all bills that were rediscounted. In addition to making loans on personal security, it was the custom of the firm to loan money for a term of years, taking a mortgage on real estate as security therefor. These loans were usually made in the name of "J. E. Potter, Agent," and the notes were transferred and assigned, without recourse, to any of their customers who desired to make investments in such securities.

J. E. Potter testified that he loaned to Mrs. Ella Smith, wife of Joe D. Smith, $2,300 in August, 1903, taking as security a mortgage on a house and lot. The note was made payable to "J. E. Potter, Agent." Miss Margaret Wintersmith was at that time a customer of P. J. Potter's Sons, and had on deposit in their bank between $2,000 and $3,000, and she applied to them for an investment of her money, and J. E. Potter recommended this Smith note and mortgage, and she agreed to accept same, and the note was assigned to her, and she took possession of it. From time to time she wrote to him when the interest was due, and he would collect same and remit to her. The note was payable on or before August 21, 1905, and on April 11, 1905, Joe D. Smith, the husband of Ella Smith, told J. E. Potter that he wanted to pay said note. He told Smith that he did not have the note; that it belonged to. Miss Wintersmith, who was then in Mexico, and was expected in a few days, but that he would take the money and place it to the credit of Miss Wintersmith, and give Smith the note as soon as Miss Wintersmith returned to Bowling Green. Before she reached Bowling Green the firm and its individual members had made an assignment. He also testified that Miss Wintersmith had frequently consulted with him about investments, and when he received this money he believed he was authorized to accept same.

Joe D. Smith testified that on or about August 21, 1903, he borrowed from J. E. Potter the sum of $2,300 and executed to him, as agent, a note for that sum due on or before two years after date, and at the same time executed a mortgage on his home for same; that the note and mortgage were really the obligations of his wife, Ella H. Smith, who obtained the money and owned the property; that he regularly, every six months, or about that time, paid the semiannual interest to J. E. Potter; that he in all these transactions acted as agent for his wife, Ella H. Smith; that on or about the ——— day

of March, 1905, J. E. Potter informed him that Miss Wintersmith wanted her interest, and he paid same with a check, and at the time of the payment of this check he informed J. E. Potter that he would shortly have the money to pay the note in full; that said Potter directed him to come and pay the money over to him; that on the 11th day of April, 1905, he took the check for $2,315.33 to J. E. Potter and paid the debt for his wife, who was then absent in California, and Mr. Potter told him that he would obtain the note in a few days and deliver the same; that he paid the money to said Potter, believing that he had full authority to collect and receive same; that he believed J. E. Potter and P. J. Potter's Sons were solvent.

It was admitted by E. L. Mottley, trustee, that J. E. Potter and P. J. Potter's Sons were, on the 11th day of April, 1905, insolvent; that from the time of the payment of the money, and until their assignment, they had on hand more than $7,000 in cash, and delivered at least that sum to the assignee (now the trustee, E. L. Mottley); and that, upon the receipt of the semiannual interest last paid, said J. E. Potter at once remitted the amount to Miss Wintersmith in Mexico.

It appears from the statement which it is stipulated Miss Wintersmith would have made, if present, that on August 31, 1903, she had as much as $2,300 on deposit in P. J. Potter's Sons Bank, and that she requested J. E. Potter to find her a good investment for same; that thereafter he reported to her that he had found a safe loan, and had informed her that it was a first mortgage on the property of Mrs. Ella H. Smith; that he made said loan, taking the note for $2,300 payable to "J. E. Potter, Agent," on or before two years after date, and on the same date transferred and assigned same to her, and delivered it to her; that said note has been since that time, and is now, in her possession; that the interest is payable semiannually, and was paid March 17, 1904, September 10, 1904, and April 8, 1905; that she left Bowling Green with her mother's family, and was absent during the winter of 1904–05; that she had said note with her and in her possession while she was thus absent; that she did not authorize, request, or direct said J. E. Potter, or any other person at or before the time said note is alleged to have been paid, or at any time, directly or indirectly, generally or otherwise, to collect said note, or to receive the proceeds of same; that, if said Potter or any other person has collected said note, it was wholly without authority from her; that she regards, and has always regarded, said note as an excellent investment, and did not at any time desire to collect same, but wanted it to run as long as the makers thereof should continue promptly to pay the interest; and that at the time she had no account with said Potter's Sons Bank.

It appears that at the close of business on April 21, 1905, the firm's books showed the cash on hand to be $72,000, but this was mainly made up of paper items carried as cash, and in fact the cash which came to the trustee was $7,158.

The referee found that on April 11, 1905, Ella H. Smith, by her agent, Joe D. Smith, in good faith, believing that J. E. Potter had

the right to receive same, paid over, in discharge of the note exe-cuted to J. E. Potter, agent, and then owned by Miss Wintersmith, the sum of $2,315.33 to said J. E. Potter; that said Potter had at the time no right to receive or collect the same; that he therefore took no title to same, but held in trust said fund for Ella H. Smith; that, when said money was deposited with P. J. Potter's Sons, they were charged with knowledge that it had been received and collected by said J. E. Potter without right, and they too hold same in trust for the use of said Ella H. Smith. And the referee added that the court is further of the opinion that, as said P. J. Potter's Sons and J. E. Potter were at the time insolvent, and J. E. Potter never had or believed he had any manner of authority to collect same, except for the purpose of remitting the same to the owner, therefore the de-posit to her credit was unauthorized and wrongful, and neither said J. E. Potter nor said P. J. Potter's Sons acquired, or could have ac-quired, any title to said money, in any event. Even had he all the au-thority claimed for him, both he and said firm, for the reasons indi-cated, had and held said money as a trust fund for the use and bene-fit of Ella H. Smith.

Claimant proved her claim as a secured debt, both against the firm and against J. E. Potter individually, and asserted a right of priority of payment as against the general creditors, upon the ground that they obtained the money as trustees for her, and held it therefore as a trustee for her benefit, and not as owners thereof; and, upon ex-ceptions being taken, the referee, upon a hearing before him, al-lowed the claim as a secured debt, and adjudged that it was entitled to preference over the general claims and debts against the estate of the bankrupts in the hands of E. L. Mottley, the trustee, and di-rected the trustee to make payment accordingly. The trustee has filed a petition for a review of this ruling, and the arguments of counsel upon the questions involved have received careful considera-tion, though our view of the case confines us to much narrower limits.

The facts we have stated do not show any relationship of principal and agent between the claimant and the bankrupts. But they do show a very plain case of intentional or unintentional deception, by means of which the bankrupts most wrongfully obtained from the claimant a large sum of money. Still the transaction in its ultimate results did no more (unless viewed from the standpoint of the criminal laws) than create an indebtedness for money had and received. No well-founded claim to an actual or constructive lien upon the money paid into the bank by the claimant can, upon general principles of equity, be advanced upon the facts disclosed by the record.

Undoubtedly the claimant's demand is provable under section 63 of the bankruptcy act (Act July 1, 1898, c. 541, 30 Stat. 562 [U. S. Comp. St. 1901, p. 3447]), but the judgment of the referee giving to her the right to have it paid in full out of the assets, before the general creditors can receive anything, must rest upon section 64b, which, so far as applicable to the question before us, provides:

"That the court shall order the trustee to pay all * * * (5) debts owing to any person who by the laws of the states or the United States is en-titled to priority." 30 Stat. 563 [U. S. Comp. St. 1901, p. 3448].

Of course the phrase "laws of the states" thus used means that priorities must be determined by the law of the particular state where the proceeding is pending, and not by the laws of all the states at once.

We know of no express statute or law of the United States which, per se, would authorize the priority adjudged by the referee, and if his ruling be proper it must find support upon some law of Kentucky. As we pointed out in Re Crow (D. C.) 116 Fed. 110, any law of Kentucky which may give a right to priority of payment remains in full force notwithstanding the enactment of the bankruptcy law. This is manifest from the provisions just quoted from section 64b. We are therefore brought to the consideration of the law of Kentucky.

We can hardly doubt that any priority of payment allowed under section 64b (5), so far as it is therein made to depend upon the "law of the state," must be evidenced by some statutory provision or by a judicial rule so certainly established as to put it upon the level of a statutory enactment, and it is clearly incumbent upon the person who claims priority to show the existence of such law. We have found no judicially established rule in Kentucky which would support the priority adjudged by the referee in this instance, nor did he in his judgment or certificate refer to any cases adjudged by the Court of Appeals, nor has the learned counsel for the claimant cited us to any. Nor do we find any provision in the Kentucky Statutes which expressly applies to this exact class of cases, though but for the element of the bankruptcy proceeding, which may possibly have nullified the assignment made April 21, 1905 (Randolph v. Scruggs, 190 U. S. 533, 23 Sup. Ct. 710, 47 L. Ed. 1165), section 74, Ky. St. 1903, might be decisive. It is as follows:

"Every voluntary assignment made by a debtor to any person in trust for his creditors shall be for the benefit of all the creditors of the assignor, in proportion to their respective claims, after the payment of the expenses of the trust; except that property, or any part thereof, conveyed by the deed or assignment, and upon which there is a valid lien, shall be first applied to the discharge of the lien debt; and if the property is not sufficient to satisfy the lien, the lien creditor shall have the right to present the remainder of his debt unsatisfied by the lien property as a claim against the estate, and receive thereon his pro rata share of the assets in the same manner as creditors whose claims are not secured by a lien; except that debts due by the assignor as guardian, committee, trustee of an express trust created by deed or will, or as personal representative, shall be paid in full before the general creditors receive anything."

Section 1916 contains even broader language. It, however, is part of the chapter on "Fraudulent and Preferential Conveyances," and possibly may be limited to such cases. It is in this language:

"In the distribution of the assets of any debtor, after the payment of the costs and expenses of the suit, the debts due as guardian, personal representative and as trustee, if the trust be created by deed or will duly recorded in the proper clerk's office, shall have priority over debts due general creditors, and property upon which there is a valid lien shall be first applied to the payment of the lien debt, and the remainder, if any, of the lien debt unsatisfied by the lien property may be presented as a claim against the estate, and the same pro rata paid thereon as upon other unpreferred debts."

Neither of these two sections in express terms relates to cases in "bankruptcy," but they certainly come very close to doing so, and they unmistakably exhibit the general public policy of the state as to the priorities. In each section priority is given only where the trust was created by deed or will, both of which instruments are required by other sections to be recorded in the proper clerk's office.

Equity and natural justice would usually place all debts upon an equal footing, giving to none a preference over the others. The bankruptcy act (section 67d, 30 Stat. 565 [U. S. Comp. St. 1901, p. 3449]), however, clearly recognizes the superior right accorded to those demands which are secured by mortgage, pledge, or other express lien. Under the Kentucky Statutes of 1903, a mortgage or deed of trust creating an express trust must be recorded (section 496). A vendor's lien must appear by recorded deed (section 2358). The claims of wards against their guardians, and the debts due from executors and administrators (personal representatives), are usually shown by the records of the courts having jurisdiction of probate business, and it is doubtless the policy of the state, as manifested by the legislation we have referred to, not to give a right to priority of payment to any demand, unless evidence of the obligation has been put upon record, whereby any person expecting to extend credit, or who is asked to extend credit, may before doing so know, or have an opportunity to know, the facts.

Undoubtedly this claimant has a just demand against the bankrupts, but that is hardly the proposition before us. The question rather is: Has she a right to be paid in full before other equally meritorious creditors are paid any part of their debts? We find no statute or judicial rule which so provides in a case like this.

It may not be out of place to remark that whatever elements or phases of moral turpitude on the part of the bankrupts, or either of them, may have attended the creation of their liability to the claimant, at last only a debt was created. From the standpoint of the law this is all, and every other creditor in this respect is in the same attitude. Moral turpitude at the inception of an indebtedness does not intensify it nor raise its grade to anything more than an obligation to pay. The creation of the legal obligation is the ultimate result. Clearly the claimant in this instance has just cause for complaint as to some of the incidents attending the creation of her debt. We might even grant that the bankrupt held the money as trustee of an express trust, as distinguished from a mere obligation to pay a debt, still we would not be able to find anything in the record which in the remotest degree indicated that the debt was due by the bankrupts or either of them under or by virtue of a trust "created by deed or will," which manifestly is the only sort of trust obligation given priority by the laws of the state. We have not found any other statute or law of Kentucky, nor have we found any statute of the United States, which otherwise gives a cestui que trust a right of priority in any case in any way resembling this. Cases may indeed be found where, in winding up insolvent national banks, persons who had had transactions with the bank shortly before its failure were repaid certain

sums in full, either because collections intrusted to the bank were not in fact made until after its failure, or upon other very special reasons; but it must be remembered that national banks are creations of Congress, and their winding up is elaborately provided for in the national banking act, while, as we have seen, we must proceed in these cases upon section 64b (5) of the bankruptcy law. Certainly it is ordinarily true that debts one year, one month, or one week old are quite as sacred and quite as much entitled to be paid as debts only one day old, although the circumstances attending the creation of the latter may be more exasperating or may appeal more to our feelings, our imagination, or our indignation. But, unless in most rare and unusual cases, all unsecured debts not barred by limitation stand upon the same footing in the view of law and equity.

There being no statute or judicial rule to justify it, the judgment of the referee must be reversed, and, upon the return of the matter to him, he is directed to disallow and reject the claim as a secured or preferred debt, and to allow it only as one of the general or unsecured debts against the bankrupts.